LECUS, Appellant v. AMERICAN MUTUAL INSURANCE
COMPANY OF BOSTON, Respondent: FIREMEN'S FUND
INSURANCE COMPANY, Defendant.

*No. 75–676. Submitted on briefs November 2, 1977.—Decided
December 13, 1977.*
(Also reported in 260 N.W.2d 241.)

For the appellant the cause was submitted on the briefs of *Jerome E. Randall* of Milwaukee.

For the respondent the cause was submitted on the brief of *Donald R. Peterson, Terry E. Johnson,* and *Borgelt, Powell, Peterson & Frauen, S. C.* of Milwaukee.

BEILFUSS, C. J. The overriding issue is whether there are disputed material facts or competing inferences in the record that entitle the plaintiff to a trial. We conclude there are and that summary judgment was not appropriate.

The accident occurred on July 14, 1972, in Winnebago county. The plaintiff, then Henny Barney, was a passenger in a 1963 Mercury. The automobile was owned by her but was being driven by Edward Lecus. Lecus and Barney were on their way from Milwaukee to Green Bay to attend an American Legion convention. The 1963 Mercury and a vehicle driven by Arnold Larson, Sr., and insured by the Firemen's Fund Insurance Company, were the vehicles involved in the collision. Neither Henny Barney nor the 1963 Mercury were insured.

Edward Lecus owned a 1964 Buick which was insured by the defendant-respondent American Mutual Insurance Company of Boston.

Henny Barney was seriously injured in the accident and commenced this action against Larson's insurer, Firemen's Fund, and Lecus' insurer, American Mutual.

After an answer to the complaint and depositions by Edward Lecus and Henny Barney, American Mutual

brought on its motion for summary judgment claiming affirmative policy defenses. The policy defenses are that the non-owned vehicle driven by Lecus was owned by Barney, that Lecus and Barney were residents of the same household and thus the non-owned vehicle driven by Lecus was excluded from coverage under his policy. A further policy defense is that the 1963 Mercury was not a temporary substitute vehicle for the disabled 1964 Buick. The pertinent policy provisions appear in the footnote.[1]

---

[1] "LIABILITY COVERAGE

"The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage, arising out of the ownership, maintenance or use of an owned automobile or a non-owned automobile, and the company shall defend any suit alleging such bodily injury or property damage and seeking damages which are payable under the terms of this policy, even if any of the allegations of the suit are groundless, false or fraudulent; but the company may make such investigation and settlement of any claim or suit as it deems expedient.

". . .

"Definitions

"When used with respect to Part I:

" 'non-owned automobile' means an automobile not owned by or furnished or available for the regular use of either the named insured or any resident of the same household; . . . but 'non-owned automobile' does not include a temporary substitute automobile;

". . .

" 'owned automobile' means

"(a) a private passenger or utility automobile or home trailer described in this policy for which a specific premium charge indicates that coverage is afforded,

"(b) a private passenger or utility automobile or home trailer of which is acquired by the named insured during the policy period.

. . .

"(c) a temporary substitute automobile, . . .

". . .

" 'temporary substitute automobile' means an automobile not owned by the named insured or any resident of the same household, while temporarily used with the permission of the owner as

Under the terms of the policy, insurance coverage was not available if Henny Barney was a resident of Edward Lecus' household as claimed by American Mutual. Nor would coverage be extended if Henny Barney's 1963 Mercury was furnished for Edward's regular use unless it was a temporary substitute vehicle.

From the depositions and affidavits in support of and in opposition to the motion for summary judgment, the following appears:

Henny Barney was divorced on March 1, 1972. She and Edward Lecus began a social relationship which culminated in marriage, just after the statutory waiting period on March 2, 1973.

Lecus owned a "cottage" on West Lapham Street in Milwaukee. On June 1, 1972, six weeks before the accident, Barney and her three children moved into the cottage. Lecus remodeled the recreation room in the basement to be used for his living quarters. Barney and the three children occupied the first and second floors. She paid Lecus $70 per month rent with funds obtained from the welfare department. She had lived there for two weeks on an earlier occasion but moved out when she found another apartment; she returned to the cottage on June 1, 1972 because the apartment she had rented was bug infested.

In Barney's affidavit she stated her occupancy was intended to be temporary; that she was actively looking for another apartment; and that most of her personal belongings remained unpacked at the time of the accident. Lecus also stated Barney was looking for another apartment prior to the accident.

Although some of the doors were lockable, Lecus stated he could pass freely from the basement to the first and second floors.

---

a substitute for an owned automobile when withdrawn from normal use for servicing or repair or because of its breakdown, loss or destruction."

Lecus generally left for work before Barney and the children were up but on a few occasions she did get up and get breakfast for him. He generally ate the evening meal with Barney and her children. She did the cooking and the children washed the dishes. One or two nights a week Barney and Lecus would eat out together. Lecus cleaned the basement and Barney the first and second floors. She did the laundry, including his.

The starter on the 1964 Buick owned by Lecus and insured by American Mutual broke about one month or four months before the accident. The vehicle was inoperable and parked next to the cottage. He stated he intended to have the starter fixed but did not have the necessary funds to do so.

Lecus took the bus to work but used Barney's car to do errands and on their evenings out. He asked for permission each time he used the car but was never denied the use of it nor were any restrictions placed on its use. How often and how extensive this use was does not appear. Lecus states the use was only occasional because all of his shopping needs were within walking distance.

The trip to Green Bay was the first time he had driven the 1963 Mercury outside of the city of Milwaukee.

Lecus was the commander of a local American Legion post. The convention at Green Bay was to last three days. Lecus and Barney were to stay in a dormitory with separate facilities for men and women.

The trial court concluded there were no material facts in dispute and that Barney's automobile was for the regular use of Lecus, that Barney and Lecus were residents of the same household and that the Mercury was not a temporary substitute automobile. Upon these facts it was concluded that American Mutual Insurance Company of Boston, by virtue of its policy provision, did not afford insurance coverage to Lecus while driving the 1963 Mercury on the day in question and was not liable to the plaintiff Henny Barney.

We have often stated summary judgment is a drastic remedy and should not be granted unless the material facts are not in dispute, no competing inferences can arise, and the law that resolves the issue is clear. Summary judgment is not to be a trial on affidavits and depositions.[2]

The American Mutual policy provides in substance that the policyholder is not protected when operating a non-owned vehicle that is owned by a resident of the same household.

In *Pamperin v. Milwaukee Mut. Ins. Co.*, 55 Wis.2d 27, 37, 197 N.W.2d 783 (1972), three factors to consider in determining residency were set forth:

"(1) Living under the same roof; (2) in a close, intimate and informal relationship; and (3) where the intended duration is likely to be substantial, where it is consistent with the informality of the relationship, and from which it is reasonable to conclude that the parties would consider the relationship '. . . in contracting about such matters as insurance or in their conduct in reliance thereon.' [Case cited.]"

However, the Pamperin test is somewhat qualified:

"The listing of three factors to be considered does not result in a threefold test with each to be required." *Belling v. Harn*, 65 Wis.2d 108, 113, 221 N.W.2d 888 (1974).

The question upon review of an order granting a motion for summary judgment is not necessarily whether the inferences that have been drawn are reasonable but whether the record reveals there are competing in-

---

[2] *Voysey v. Labisky*, 10 Wis.2d 274, 103 N.W.2d 9 (1960); *Foryan v. Firemen's Fund Ins. Co.*, 27 Wis.2d 133, 133 N.W.2d 724 (1965); *Hardscrabble Ski Area v. First Nat. Bank*, 42 Wis.2d 334, 166 N.W.2d 191 (1969); *Ramsden v. Hawkinson Gas Service Co.*, 63 Wis.2d 455, 217 N.W.2d 322 (1974).

ferences that could be considered reasonable. We have no quarrel with the inferences drawn by the trial court nor the findings of fact it did make, but that is not the function of a motion for summary judgment. We have stated innumerable times a motion for summary judgment does not contemplate nor permit a trial upon affidavits or depositions, and that if there are any material facts in dispute or competing reasonable inferences the party resisting the motion is entitled to a trial.

Certainly upon the question of residency in a given household the intention of the parties is one of the most important evidentiary questions to be considered. While it is true the "actions sometimes speak louder than words" intention is a subjective state of mind to be determined upon all of the facts including the declarations of the person inquired about.

We have stated—". . . the issue of . . . intent is not one that properly can be decided on a motion for summary judgment. Credibility of a person with respect to his subjective intent does not lend itself to be determined by affidavit."[3]

Without restating the factual excerpts from the depositions and affidavits as set forth above, we conclude there are competing reasonable inferences as to the residence question and that the plaintiff is entitled to have these resolved after a trial by the trier of fact whether it be by a judge or jury.

We are next concerned with whether Barney's car was available for Lecus' regular use. Although he did not use it to go to work, Edward was allowed to use it whenever he wished to. His requests were always granted, and no restrictions were placed on his use of it.

---

[3] *Doern v. Crawford*, 30 Wis.2d 206, 214, 140 N.W.2d 193 (1966).

This court has held that where a case concerning regular use presents no questions of fact the issue is appropriate for determination by summary judgment. *Moutry v. American Mut. Liability Ins. Co.*, 35 Wis.2d 652, 656, 151 N.W.2d 630 (1967); *Jones v. Perkins*, 75 Wis.2d 18, 23, 248 N.W.2d 468 (1977). Here the only issue is whether Edward's use was a regular use.

*Le Mense v. Thiel*, 25 Wis.2d 364, 367, 130 N.W.2d 875 (1964), delineated the spectrum of possible situations in a regular use case:

"The meaning of the words 'regular use' in an automobile insurance policy such as is involved here is one that has frequently been before the courts. Obviously, each case which arises under this clause must turn on its own peculiar facts. On each end of the spectrum are the easy cases. If the use of the auto is sporadic and rigidly restricted, there is coverage under the policy. At the other end of the spectrum are those cases in which the use is unqualified and continuous; in these cases the denial of coverage is obvious. The doubtful cases are those in the middle."

This case falls in the middle—there were no restrictions on use, but use was not continuous and the extent of his use does not clearly appear.

In *Le Mense*, 25 Wis.2d at 370, this court first cited *Aler v. Travelers Indemnity Co.*, 92 F. Supp. 620, 623 (D.C. Md. 1950), which held that the purpose of the regular use clause is:

". . . to give coverage to the insured while engaged in the only infrequent or merely casual use of an automobile other than the one described in the policy, but not to cover him against personal liability with respect to his use of another automobile which he frequently uses, or has the opportunity to do so."

We again conclude there is an issue of fact for determination after trial as to the extent and regularity of the use.

Even if it is established that the car was available for Lecus' regular use, this is not a bar to coverage if the car was a "temporary substitute automobile."[4] It is clear that Barney's vehicle was a substitute for Edward's broken down Buick. The question is whether it was a temporary substitute.

The respondent, American Mutual, sets forth two criteria which it claims are of primary importance in cited foreign cases on temporary substitutes: (1) That the substitute is used while the owned vehicle is disabled and undergoing repair, and (2) that the substitute is used for a definite and very limited period of time, ranging from as little as one day to eighteen days. These cases do contain these factors. But to suggest that they are requirements is misleading.

Actually, this clause is the subject of considerable dispute and very little can be considered to be well settled. For example, American Mutual's case of *Armstrong v. Nationwide Mut. Ins. Co.*, 215 Va. 333, 209 S.E.2d 903 (1974), held that failure to repair a car over a four-month period constituted abandonment of the owned car in spite of the owner's initial efforts to repair and his intent to repair when possible. As such the substitute auto was held nontemporary and coverage was denied. On the other hand, *Harte v. Peerless Ins. Co.*, 123 Vt. 120, 183 A.2d 223 (1962), held that a three-month period of non-use without repair was not sufficient to show abandonment and bar recovery.

In *State Farm Mut. Automobile Ins. Co. v. Johnston*, 107 Cal. Rptr. 149, 507 P.2d 1357 (1973), the Supreme Court of California held that a car which completely and permanently replaced the insured car was a temporary substitute under the same clause involved here. The court held that "temporary" was ambiguous: ". . . a word of much elasticity and considerable indefiniteness,"

---

[4] *Lewis v. Bradley*, 7 Wis. 2d 586, 595, 97 N.W.2d 408 (1959).

and that doubts as to its meaning must be construed against the insurer. The rule that ambiguities in an insurance policy are to be construed against the insurance company is often stated to be the rule in Wisconsin.[5]

In *Lewis v. Bradley*, 7 Wis.2d 586, 591–92, 97 N.W.2d 408 (1959), we stated:

"A substitute automobile within the meaning of the policy is one actually, but only temporarily used in place of the specified automobile. . . ."

Thus the substitute use is limited in Wisconsin. But what that limit may be is not clear under our decided cases.

The word "temporary" is ambiguous because it can be understood by well informed persons in either two or more senses.[6] Certainly the opposite of temporary is permanent. If the trial court meant that Henny's car was a permanent substitute, there are facts which run counter to this finding, and it may not stand on summary judgment.

If all that was wrong with his vehicle was a broken starter it does seem probable that he would have the car repaired. It does not appear he made any attempt to sell the Buick. There is also a question as to when the car actually became inoperative. If it was withdrawn from use for four months prior to the accident then there might be a permissible inference of abandonment. If it was inoperable for only a month then the claim that Lecus was short of funds and intended to fix it eventually has considerably more credence and weight.

In any event, we do not believe the trial court considered the ambiguous nature of the word "temporary" and did not interpret the word in favor of coverage.

[5] *Manitowoc v. Iowa National Mut. Ins. Co.*, 68 Wis.2d 722, 229 N.W.2d 577 (1975); *Garriguenc v. Love*, 67 Wis.2d 130, 226 N.W.2d 414 (1975).

[6] *Czaicki v. Czaicki*, 73 Wis.2d 9, 14, 242 N.W.2d 214 (1976).

This court has not specifically defined the word "temporary" as used in the context of the policy under consideration. To do so on this review of an order for summary judgment is not appropriate. The issue should be resolved upon the facts of the case. Proper inquiries would be the age and value of the car, the cost of repair, the reasonable time to repair, reason for delay in having the vehicle repaired, the advisability of repair as contrasted to sale or abandonment, and other material facts as they develop at trial that will assist the trier of fact in determining the reasonableness of the temporary use of a substitute vehicle. This issue we believe should also be resolved after a trial.

*By the Court.*—Judgment reversed and cause remanded for further proceedings not inconsistent with this opinion.